Rockingham
No. 2004-011

THE STATE OF NEW HAMPSHIRE

v.

JOHN BEAUCHESNE

Argued: October 13, 2004
Opinion Issued: March 4, 2005

804

*Kelly A. Ayotte*, attorney general (*Jane E. Young*, senior assistant attorney general, on the brief and orally), for the State.

*Dawnangela Minton*, assistant appellate defender, of Concord, on the brief, and *Andrew S. Winters*, assistant appellate defender, of Concord, orally, for the defendant.

DUGGAN, J. Following a bench trial on stipulated facts, the defendant, John Beauchesne, was convicted of possession of cocaine, *see* RSA 318-B:2 (2004), possession of marijuana, *see* RSA 318-B:26 (2004), and resisting detention, *see* RSA 642:2 (1996). On appeal, he challenges his convictions for possession of cocaine and marijuana, arguing that the Superior Court (*O'Neill*, J.) erroneously denied his motion to suppress the cocaine and marijuana. The defendant does not challenge his conviction for resisting detention. We reverse and remand.

The trial court found the following facts. On September 27, 2002, Detective Peter Morelli of the Derry Police Department was on duty patrolling downtown Derry. Detective Morelli was in an unmarked cruiser,

wearing street clothes and "on the lookout for 'drug crime.'" Although Detective Morelli testified that he previously had investigated drug transactions in the area he was patrolling, he also testified that a drug transaction was no more likely to occur there than any other area in Derry.

At approximately 6:30 p.m., Detective Morelli observed two men standing in an alley off Railroad Avenue. One man was straddling a bike. The defendant was facing the man on the bike. Detective Morelli saw the defendant hand something small and "unidentifiable" to the man straddling the bike, then turn and walk toward the street.

Believing that he had just witnessed a drug transaction, Detective Morelli stopped and exited his cruiser, made eye contact with the defendant and motioned for the defendant to approach him. The defendant did not respond and walked away. Detective Morelli then yelled to the defendant, identifying himself as a police officer and ordering the defendant to stop. The defendant again did not respond and continued walking away.

Detective Morelli followed the defendant on foot. When he saw that the defendant was running away, Detective Morelli again yelled that he was a police officer and ordered the defendant to stop. The defendant continued to run and Detective Morelli followed him. Detective Morelli eventually caught up with the defendant and attempted to grab him. The defendant, however, fell to the ground. During his fall, the defendant either dropped or threw a plastic bag containing a green vegetative matter, which Detective Morelli was able to identify immediately as marijuana. Detective Morelli then fell over the defendant.

Detective Morelli arrested the defendant for resisting detention and possessing marijuana. Detective Morelli subsequently searched the defendant's person and discovered a quantity of cocaine.

The defendant moved to suppress the cocaine and marijuana obtained as a result of the seizure because Detective Morelli lacked reasonable, articulable suspicion when he first ordered the defendant to stop. The trial court denied the motion, ruling that under *California v. Hodari D.*, 499 U.S. 621, 626 (1991), the defendant was not seized until he "fell and thus submitted to the detective's show of authority," at which time Detective Morelli had reasonable, articulable suspicion that the defendant had committed a crime.

On appeal, the defendant argues that the trial court erred in ruling that, under Part I, Article 19 of the State Constitution, the defendant was not seized until he submitted to Detective Morelli's show of authority. To that

end, the defendant argues that we should not adopt the holding in *Hodari D.*, which requires submission to a show of authority, for determining when a seizure occurs under the State Constitution. In addition, the defendant argues that because he was seized for State constitutional purposes when Detective Morelli ordered him to stop, the trial court erred in denying his motion to suppress the cocaine and marijuana because the detective lacked reasonable, articulable suspicion at the time of the seizure.

## I. Preservation

We must first determine whether the defendant preserved the State constitutional issue. The State argues that because the defendant never argued that the *Hodari D.* rule should be rejected as a matter of State constitutional law, the defendant did not preserve the issue of whether Part I, Article 19 of the State Constitution provides greater protection than the Fourth Amendment. We disagree.

Since *State v. Ball*, 124 N.H. 226, 232 (1983), we have consistently followed the "primacy" approach to adjudication of constitutional issues. *See* Williams, *In the Glare of the Supreme Court: Continuing Methodology and Legitimacy Problems in Independent State Constitutional Rights Adjudication*, 72 NOTRE DAME L. REV. 1015, 1018 (1997). This means that when a defendant specifically invokes the State Constitution, we will consider those constitutional claims before addressing federal claims. *State v. Dellorfano*, 128 N.H. 628, 632 (1986). Nonetheless, decisions from the United States Supreme Court are important in our State constitutional analysis. We scrutinize these decisions and, if they are logically persuasive and well reasoned, paying due regard to precedent and policies underlying specific constitutional guarantees, such decisions may properly claim persuasive weight as guideposts when interpreting State constitutional guarantees. *See* Brennan, *State Constitutions and the Protection of Individual Rights*, 90 HARV. L. REV. 489, 502 (1977). As our former colleague, Justice Souter, observed, "If we place too much reliance on federal precedent we will render the State rules a mere row of shadows; if we place too little, we will render State practice incoherent." *State v. Bradberry*, 129 N.H. 68, 83 (1986) (Souter, J., concurring).

Given the significance of State constitutional analysis, the defendant must raise the State constitutional issue in the trial court and the defendant's brief must specifically invoke a provision of the State Constitution. *Dellorfano*, 128 N.H. at 632. The State does not argue that

the defendant's brief does not specifically invoke a provision of the State Constitution. Instead, the State argues that the defendant did not adequately raise the Part I, Article 19 issue in the trial court because at no point did trial counsel explicitly urge the trial court not to follow *Hodari D.*

The defendant raised the State constitutional issue in both his written motion and at the suppression hearing. The defendant's motion to suppress relied upon Part I, Article 19 of the State Constitution to argue that Detective Morelli lacked reasonable, articulable suspicion when he ordered the defendant to stop. At the suppression hearing, defense counsel relied upon *State v. Riley*, 126 N.H. 257 (1985), and *State v. Quezada*, 141 N.H. 258 (1996), to argue that the seizure occurred when the detective ordered the defendant to stop. This argument, on these facts, was squarely at odds with *Hodari D.* and essentially asked the trial court not to rely on *Hodari D.* Indeed, in response to the defendant's argument, the State invoked *Hodari D.* to argue that the defendant was not stopped until he fell and submitted to Detective Morelli.

■ In its order, the trial court noted that the defendant "invoke[d] the protections of both Part I, Article 19 of the New Hampshire Constitution and the Fourth and Fourteenth Amendments to the United States Constitution." The trial court then denied the defendant's motion, relying upon *Hodari D.* and Part I, Article 19, thereby apparently concluding that *Hodari D.* was the governing rule under both the State and Federal Constitutions. On this record, we conclude that the defendant sufficiently raised the State constitutional issue in the trial court.

■ The State also argues that the *Hodari D.* issue raised in the defendant's brief was not raised in his notice of appeal and thus should not be considered on appeal. SUP. CT. R. 16(3)(b); *see State v. Blackmer*, 149 N.H. 47, 49 (2003). The issue raised in the defendant's notice of appeal is "[w]hether the Court erred in denying the defendant's motion to suppress where no reasonable suspicion existed to conduct an investigatory stop[.]" New Hampshire Supreme Court Rule 16(3)(b) provides that "[t]he statement of a question presented will be deemed to include every subsidiary question fairly comprised therein." Here, a subsidiary question as to whether there was reasonable suspicion for the investigatory stop is whether, or at what point, there was an investigatory stop. Thus, the issue briefed is subsidiary to the issue in the notice of appeal and is properly before us. *See State v. Jimenez*, 137 N.H. 450, 452 (1993).

*II. Seizure*

Turning to the merits of this appeal, the defendant argues that he was subject to an unlawful seizure because Detective Morelli lacked reasonable suspicion when he first ordered the defendant to stop. Accordingly, the defendant argues that the trial court erred in denying his motion to suppress the cocaine and marijuana as fruits of the unlawful seizure.

In reviewing the trial court's rulings, we accept its factual findings unless they lack support in the record or are clearly erroneous. *State v. Wallace*, 146 N.H. 146, 148 (2001). Our review of the trial court's legal conclusions, however, is *de novo*. *Id.*

 It is well settled that "[i]n order for a police officer to undertake an investigatory stop, the officer must have a reasonable suspicion—based on specific, articulable facts taken together with rational inferences from those facts—that the particular person stopped has been, is, or is about to be, engaged in criminal activity." *State v. Hight*, 146 N.H. 746, 748 (2001) (quotation omitted). An investigatory stop is a very limited seizure. *State v. Brodeur*, 126 N.H. 411, 415 (1985). Thus, in deciding whether Detective Morelli conducted a lawful investigatory stop, we must conduct a two-step inquiry. First, we must determine when the defendant was seized. *See Quezada*, 141 N.H. at 259. Second, we must determine whether, at that time, Detective Morelli possessed a reasonable suspicion that the defendant was, had been or was about to be engaged in criminal activity. *See id.* at 260.

The crux of this appeal is the determination of when, under Part I, Article 19 of the State Constitution, the defendant was seized. The defendant argues that, for State constitutional purposes, he was seized when Detective Morelli first ordered him to stop. The State, relying upon the holding in *Hodari D.*, argues that the defendant was seized when he fell and submitted to Detective Morelli's show of authority.

 Not all interactions between the police and citizens involve a seizure of the person. *State v. Cote*, 129 N.H. 358, 364 (1987). "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). This is true "[s]o long as a reasonable person would feel free to disregard the police and go about his business." *Id.* (quotation omitted). Indeed, the police may request to examine the individual's identification or for consent to search the individual or his belongings. *Id.* at 435. The person stopped, however, is not obliged to answer and the police may not convey a message that

compliance with their request is required. *Id.; Terry v. Ohio,* 392 U.S. 1, 34 (1968) (*White,* J., concurring). Moreover, unless the police officer has reasonable suspicion, the person approached may not be detained. *Terry,* 392 U.S. at 34 (*White,* J., concurring).

■ An interaction between a police officer and a citizen becomes a seizure, however, when a reasonable person believes he or she is not free to leave. *United States v. Mendenhall,* 446 U.S. 544, 554 (1980); *Riley,* 126 N.H. at 262 (adopting the *Mendenhall* definition of seizure). This occurs when an officer, by means of physical force or show of authority, has in some way restrained the liberty of the person. *Cote,* 129 N.H. at 364. Circumstances indicating a "show of authority" might include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Quezada,* 141 N.H. at 259. The analysis is an objective one, requiring a determination of whether the defendant's freedom of movement was sufficiently curtailed by considering how a reasonable person in the defendant's position would have understood his situation. *Id.* at 259-60.

In *Hodari D.,* the United States Supreme Court addressed the "narrow question . . . whether, with respect to a show of authority . . . a seizure occurs even though the subject does not yield." *Hodari D.,* 499 U.S. at 626. In that case, two police officers on patrol in a high-crime area observed four or five youths, including the defendant, huddled around a car parked at the curb. *Id.* at 622. When the youths saw the police car approach, they ran. *Id.* at 622-23. One of the officers exited the car and pursued the defendant on foot. *Id.* at 623. As the officer neared, the defendant tossed away what was later determined to be crack cocaine. *Id.* The Court concluded that the defendant was not seized when the police officer was pursuing him and, thus, the cocaine was admissible because he had not yet been seized when he discarded it. *Id.* at 626. Rather, relying primarily upon the dictionary definition of seizure and the common law of arrest, the Court held that:

> The word "seizure" readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful. ("She seized the purse-snatcher, but he broke out of her grasp.") It does not remotely apply, however, to the prospect of a policeman yelling "Stop, in

the name of the law!" at a fleeing form that continues to flee. That is no seizure.

*Id.* Accordingly, the Court held that a seizure "requires *either* physical force... *or*, where that is absent, *submission* to the assertion of authority." *Id.*

Several States have considered whether to adopt the holding in *Hodari D.* for determining when a seizure occurs under their respective state constitutions. Numerous state courts have rejected *Hodari D.* on state constitutional grounds. The Supreme Court of Tennessee summarized the "extensive criticisms" of *Hodari D.* as follows:

> First, the majority's analysis in *Hodari D.* represents a marked departure from the standard the Supreme Court adopted in *United States v. Mendenhall,* [446 U.S. at 554,] *i.e.,* that a seizure occurs when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." Second, the majority's analysis fails to apply common law principles under which an arrest would not be distinguished from an attempted arrest in determining whether a person has been seized. Third, the majority's analysis is flawed for practical reasons and is subject to potential abuse by officers who pursue a subject without reasonable suspicion and use a flight or refusal to submit to authority as reason to execute an arrest or search.

*State v. Randolph,* 74 S.W.3d 330, 336 (Tenn. 2002); *see also State v. Oquendo,* 613 A.2d 1300, 1310 (Conn. 1992); *Jones v. State,* 745 A.2d 856, 864-66 (Del. 1999) (noting that *Hodari D.* is inconsistent with the State's historic commitment to protecting the privacy of citizens because it "would allow a police officer lacking reasonable suspicion to create that suspicion through an unjustified attempted detention"); *Com. v. Stoute,* 665 N.E.2d 93, 97 (Mass. 1996) (noting that pursuit is no less intrusive on a person's freedom of movement than a stop); *State v. Clayton,* 45 P.3d 30, 33-34 (Mont. 2002) (noting that *Hodari D.* imposes "a subjective element to the traditionally objective test of whether a seizure has occurred" and that utilizing an objective test "allows the police to determine in advance whether the conduct contemplated will implicate [the state constitution] and does not shift the focus of the inquiry to a person's subjective reaction to police conduct"); *State v. Tucker,* 642 A.2d 401, 405 (N.J. 1994) (noting that the Supreme Court's reliance on dictionary definitions of seizure "may be misplaced" because although "[t]he Court correctly states that the

officer's chase was not a common-law arrest, [it] fails to point out that this conduct amounted to an attempted arrest, which was also unlawful at common law" (quotation omitted)); *Com. v. Matos*, 672 A.2d 769, 775 (Pa. 1996) (rejecting *Hodari D.* because it is inconsistent with Pennsylvania's recognition that "our citizens enjoy a strong right of privacy, and that our citizens are therefore entitled to broader protection in certain circumstances under our state constitution").

Of the States that have adopted *Hodari D.* under their state constitutions, many do so noting that they do not have a history of providing greater privacy protection to their citizens than the Federal Constitution. *See, e.g., Perez v. State*, 620 So. 2d 1256, 1258 (Fla. 1993) (noting that the Florida Constitution specifically prohibits a court from interpreting the Florida Constitution as providing greater protection than the Fourth Amendment to the United States Constitution); *State v. Cronin*, 509 N.W.2d 673, 676 (Neb. Ct. App. 1993) ("Nebraska has neither an explicit constitutional right of privacy nor a history of affording individuals greater rights than are afforded by the federal Constitution.").

In contrast, we have recognized that our State Constitution incorporates a strong right of privacy and provides greater protection for individual rights than the Federal Constitution. *See State v. Canelo*, 139 N.H. 376, 387 (1995); *Ball*, 124 N.H. at 235. Accordingly, we are persuaded by the reasoning of those States that have declined to adopt the holding in *Hodari D.* for determining when a seizure occurs as a matter of State constitutional law.

We have held that Part I, Article 19, provides greater protection for individual rights than does the Fourth Amendment. *See Ball*, 124 N.H. at 235. Indeed, we have recognized that "[o]ur Constitution has historically been interpreted to incorporate a strong right of privacy." *Canelo*, 139 N.H. at 387 (quotation omitted). In *Canelo*, for instance, we adopted the exclusionary rule under the State Constitution because it served to deter police misconduct and "to redress the injury to the privacy of the search victim." *Id.* We also declined to adopt a good faith exception to the exclusionary rule because it was "incompatible with and detrimental to our citizens' strong right of privacy inherent in part I, article 19." *Id.*

■ Likewise, the *Hodari D.* rule is incompatible with the guarantees of Part I, Article 19. As the Massachusetts Supreme Judicial Court aptly noted:

> [S]tops provoke constitutional scrutiny because they encumber a person's freedom of movement. Pursuit that appears designed to

> effect a stop is no less intrusive than a stop itself. Framed slightly differently, a pursuit, which, objectively considered, indicates to a person that he would not be free to leave the area (or to remain there) without first responding to a police officer's inquiry, is the functional equivalent of a seizure, in the sense that the person being pursued is plainly the object of an official assertion of authority, which does not intend to be denied, and which infringes considerably on the person's freedom of action.

*Stoute*, 665 N.E.2d at 97 (quotation, citation and brackets omitted). Because of the intrusiveness of a police officer's assertion of authority, requiring police officers to possess reasonable suspicion prior to asserting their authority is necessary to adequately protect individual rights under the State Constitution. Thus, under Part I, Article 19 of the State Constitution, a police officer must possess reasonable suspicion before taking an action that would communicate to a reasonable person that he or she is not free to leave.

Our holding today is supported by sound practical and policy reasons. First, focusing the definition of seizure on the police officer's conduct, and not the individual's conduct, results in the same State constitutional implications for similar police conduct. In this case, for example, Detective Morelli's conduct of identifying himself as a police officer and ordering the defendant to stop is the same, whether or not the defendant submitted to the officer's show of authority. It would be an anomaly to hold that the officer's conduct was a seizure had the defendant submitted, but because the defendant did not submit, the same conduct by the officer was not a seizure. If the officer's attempt to detain the defendant lacks reasonable suspicion, it is unlawful whether or not the defendant submits to the show of authority. Thus, by defining the moment a seizure occurs by the police officer's conduct, "the police [can] determine in advance whether the conduct contemplated will implicate [the state constitution]." *Clayton*, 45 P.3d at 34.

Second, constitutional protections become "meaningful only when it is assured that at some point the *conduct of those charged with enforcing the laws* can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure." *Terry*, 392 U.S. at 21 (emphasis added). The *Mendenhall* test achieves this goal by providing an objective standard for judicial review of the seizure. *See Mendenhall*, 466 U.S. at 554. Thus, our holding allows courts to

continue to objectively evaluate the reasonableness of the police officer's actions, not the defendant's reaction. *See Terry*, 392 U.S. at 21.

Third, we do not write on a blank slate for defining when a seizure occurs. An analysis that focuses exclusively on the conduct of the police is, as several state courts have pointed out, consistent with the well-settled definition of seizure in *Mendenhall*. *See, e.g., Tucker*, 642 A.2d at 404-05; *Randolph*, 74 S.W.3d at 336-37. It is also consistent with our holding in *Quezada*, 141 N.H. at 260. In *Quezada*, a police officer called to the defendant, "Hey, you, stop," and after the defendant did not respond, called out again, "Hey, I want to speak to you." *Id.* at 258-59. One of the key factors in our analysis of whether a seizure occurred was that the officer used "language indicating that compliance was not optional." *Id.* at 260. We thus concluded that, "[g]iven the late hour, the absence of other citizens in the vicinity, the presence of two uniformed police officers, and the language of [the officer's] requests, no reasonable person would have believed he was free to ignore the officer and simply walk away." *Id.* at 260. In holding that there was a sufficient "show of authority" to effect a seizure, our analysis focused upon the officer's actions and the other surrounding circumstances. *See id.* The defendant's reaction was not a part of our seizure analysis. *See id.*

Finally, our holding serves to effectuate the goal of the exclusionary rule to deter police misconduct. Indeed, one of the primary criticisms of the holding in *Hodari D.* is that it is subject to potential abuse. *See, e.g., Stoute*, 665 N.E.2d at 97-98 (noting that the holding in *Hodari D.* would allow "the police [to] turn a hunch into a reasonable suspicion by inducing the conduct ... justifying the suspicion" (quotation omitted)). Thus, because the police are not required to possess reasonable suspicion prior to asserting their authority under *Hodari D.*, that rule "will encourage unlawful displays of force that will frighten countless innocent citizens into surrendering whatever privacy rights they may still have." *Hodari D.*, 499 U.S. at 646-47 (*Stevens*, J., dissenting).

Having determined when a seizure occurs under Part I, Article 19, we must now determine when the defendant was seized. As stated above, a seizure occurs only when a reasonable person believes he is not free to leave because the officer, by means of physical force or show of authority, has in some way restrained the liberty of the person. *Cote*, 129 N.H. at 364. The analysis is an objective one, requiring a determination of whether the defendant's freedom of movement was sufficiently curtailed by considering how a reasonable person in the defendant's position would have understood his situation. *Id.* at 259-60.

█ In this case, although Detective Morelli was in an unmarked cruiser and wearing street clothes, he yelled to the defendant, identified himself as a police officer and ordered the defendant to stop. Detective Morelli then pursued the defendant on foot, again identifying himself as a police officer and ordering the defendant to stop. In view of all the circumstances, the encounter transcended a mere request to communicate. Given Detective Morelli's repeated identification of himself as a police officer and his orders to stop, no reasonable person would have believed he was free to ignore the officer and simply walk away. *See id.* at 260. Thus, the defendant was seized when Detective Morelli first identified himself as a police officer and ordered the defendant to stop.

### III. Reasonable Suspicion

Having determined that the defendant was seized when Detective Morelli identified himself as a police officer and yelled, "stop," we must next determine whether he had reasonable suspicion at the moment of seizure. We hold that he did not.

In order for a police officer to undertake an investigatory stop, the officer must have reasonable suspicion, based upon specific, articulable facts taken together with reasonable inferences from those facts, that the particular person stopped has been, is or is about to be, engaged in criminal activity. *State v. Roach,* 141 N.H. 64, 66 (1996).

█ Here, Detective Morelli did not witness sufficient facts to indicate that criminal activity was afoot. He observed two men he did not know standing in an alley and one man handing something small and "unidentifiable" to another man. The detective testified that this was neither an area where drug transactions were more likely to occur, nor was it a late hour. These facts, either alone or in combination, do not support a finding of reasonable suspicion. *See State v. Dodier,* 135 N.H. 134, 139 (1991) (finding no reasonable suspicion where the police officer observed two men talking in a truck, they appeared nervous when he approached and the driver made a furtive gesture).

### IV. Resisting Detention

The State argues that, even though the seizure was illegal, the defendant's conduct in resisting detention justifies the admission of the marijuana and cocaine. The defendant argues that, although the State should be allowed to prosecute him for resisting detention, the marijuana

and cocaine should be suppressed because they were fruits of the initial unlawful seizure.

A person is guilty of resisting detention, a misdemeanor, "when the person knowingly or purposely physically interferes with a person recognized to be a law enforcement official . . . seeking to effect an arrest or detention of the person or another regardless of whether there is a legal basis for the arrest." RSA 642:2. Thus, the defendant was convicted of resisting detention, even though Detective Morelli lacked reasonable suspicion to detain him pursuant to Part I, Article 19 of the State Constitution. Accordingly, the State argues that the marijuana and cocaine were properly admitted because Detective Morelli had a right to arrest and search the defendant once he broke the law by resisting detention. In effect, the State contends that the crime of resisting arrest either purged the taint of the unlawful seizure or triggered the application of either the independent source or inevitable discovery exceptions to the exclusionary rule. *See Hight,* 146 N.H. at 750; *State v. Hill,* 146 N.H. 568, 573 (2001); *State v. Holler,* 123 N.H. 195, 200 (1983).

The State's premise for this argument is correct. A police officer has the right to seize any person whom the officer observes breaking the law. RSA 594:10, I(a) (2001). A subsequent search of the person is justified as incident to a lawful arrest. *State v. Murray,* 135 N.H. 369, 374 (1992). But, as the Delaware Supreme Court aptly held, "the crime of resisting an illegal [detention] does not necessarily carry with it the right to justify any search incident to an actual arrest for the crime of resisting an illegal [detention]. Otherwise there would be significant potential for official abuse." *Jones,* 745 A.2d at 872.

In *Jones,* a police officer, responding to an anonymous 911 call reporting the presence of a "suspicious black male wearing a blue coat," attempted to stop the defendant, who matched the caller's description. *Id.* at 858-59 (quotation omitted). The police officer approached the defendant and ordered him to stop and remove his hands from his pockets. *Id.* at 859. The defendant did not comply and simply turned and walked away. *Id.* The police officer repeated the order three times, but the defendant continued to ignore him. *Id.* The officer then grabbed the defendant, at which time the defendant threw something away. *Id.* The defendant was arrested for resisting arrest and a search of his person resulted in the seizure of cocaine. *Id.* The object that had been thrown away was later determined also to be cocaine. *Id.*

The defendant was charged with, among other things, possession of cocaine and resisting arrest. *Id.* The trial court denied the defendant's

motion to suppress the cocaine. *Id.* at 859-60. On appeal, the Delaware Supreme Court reversed. *Id.* at 873-74. On State constitutional grounds, the court rejected the holding in *Hodari D.* and held that the defendant was seized when the police officer first ordered the defendant to stop and, at that time, the officer lacked reasonable suspicion. *Id.* at 869, 871-72.

The court then addressed the State's argument that, even though the initial seizure of the defendant was unlawful, the cocaine should be admissible because the defendant committed a new crime, resisting arrest, for which he could lawfully be arrested and searched. *Id.* at 872. The court recognized that, as a general proposition, the State's reasoning was correct. *Id.* Nonetheless, the court held that "there are state constitutional dimensions to the enforcement of the exclusionary rule" and that "those dimensions are correlative to fundamental ... state constitutional rights and to preserving the integrity of the judicial system." *Id.* at 873. Accordingly, the court determined that it "must look beyond the facts of this individual case and weigh the potential for abuse if [it] were to establish a precedent that would allow the admission of evidence seized as a result of a defendant's resisting an illegal arrest." *Id.* In doing so, the court recognized the validity of the defendant's conviction for resisting an illegal arrest, but concluded that, in order to protect state constitutional rights to be free from illegal searches and seizures, "the State may not use as evidence the fruits of a search incident to an illegal arrest." *Id.* To hold otherwise, the court noted, "would be a result reached by bootstrap analysis." *Id.*

We are persuaded by the Delaware Supreme Court's recognition of the correlation between the scope of the exclusionary rule and the protection of constitutional rights. Likewise, we must consider the application of the exceptions to the exclusionary rule in a manner that does not nullify important state constitutional rights. *See id.* at 872.

■■ ■■ The exclusionary rule acts as a remedy for a violation of a defendant's right to be free from illegal searches and seizures. *Canelo*, 139 N.H. at 386. It provides for the exclusion from trial of any evidence recovered or derived from an illegal search and seizure. *Id.* at 383-84. Nevertheless, there are exceptions to this rule. For example, the exclusionary rule does not bar the admissibility of evidence if the State proves that circumstances exist such that the taint of the primary illegality is purged, *Hight*, 146 N.H. at 750, or if the police had an independent source for the evidence untainted by their misconduct, *Holler*, 123 N.H. at 200, or if the police would have inevitably discovered the evidence, *Hill*,

146 N.H. at 573. These exceptions recognize that the official misconduct should not fatally taint evidence that would have been discovered absent that misconduct. For practical and policy reasons, however, the case before us is different.

The purpose of the exclusionary rule is three-fold. The rule serves to deter police misconduct, to redress the injury to the privacy of the victim of the unlawful search or seizure and to safeguard compliance with State constitutional protections. *Canelo*, 139 N.H. at 387. Indeed, "[w]e view the exclusionary rule as a logical and necessary corollary to achieve the purposes for which prohibitions against unreasonable searches and seizures were constitutionalized." *Id.* at 386. Thus, we must consider whether, in these circumstances, allowing the admission of evidence seized as a result of a defendant's resisting an illegal arrest would contradict our strong commitment to protecting State constitutional rights.

The purpose behind the law that resisting even an illegal arrest or detention constitutes a crime is to foster the effective administration of justice, to discourage self-help and to provide for the safety of police officers. *See State v. Haas*, 134 N.H. 480, 484 (1991). As we have recognized:

> A society which seemingly becomes more complex with each passing day is enlightened when its laws reflect a high purpose to have apparent differences between those who wield the authority of government, and those who do not, resolved in the courts or by some other orderly process, rather than by physical confrontation on the street or in the gutter.

*Id.* Nonetheless, this purpose cannot be used to eradicate an individual's constitutional right to be free from unreasonable searches and seizures. Accordingly, in order to protect important State constitutional rights, it is "logical and necessary" to apply the exclusionary rule to situations where the initial seizure is unlawful and the defendant then violates RSA 642:2. *See Canelo*, 139 N.H. at 386.

Our holding is consistent with the purposes of the exclusionary rule. *See id.* at 387. Indeed, a contrary holding would encourage unlawful stops and render hollow our rejection of *Hodari D.* Moreover, as a practical matter, applying the exclusionary rule in this case achieves a proper balance between society's interest in deterring unlawful police conduct and the public interest in prosecuting crimes by placing the parties in the position they would have been in had there been no violation of the defendant's

constitutional right to be free from unreasonable seizures. *See id.* (reasoning that "[e]nforcement of the [exclusionary] rule places the parties in the position they would have been in had there been no violation of the defendant's constitutional right[s]" (quotation and ellipses omitted)); *see also Murray v. United States*, 487 U.S. 533, 537 (1988) (noting that the independent source doctrine strikes the proper balance by putting the police in the same position that they would have been in if no police misconduct had occurred). Finally, applying the exclusionary rule in these circumstances preserves the integrity of the rationale underlying much of our constitutional seizure analysis. This is true in both our recognition that not all interactions between the police and citizens involve a seizure of the person, *Cote*, 129 N.H. at 364, and our requirement that a person may not be detained unless the police officer has reasonable suspicion, *Hight*, 146 N.H. at 748.

We fully appreciate that, on the facts presented in this case, Detective Morelli had a good faith belief that he had reasonable suspicion to stop the defendant. The facts here are simply not as egregious as in *Jones. See Jones*, 745 A.2d at 858-59. Nonetheless, we have unequivocally rejected a good faith exception to the exclusionary rule. *See Canelo*, 139 N.H. at 387. Thus, application of the exclusionary rule is appropriate on these facts in order to safeguard important constitutional rights.

 Accordingly, because Detective Morelli lacked reasonable suspicion when he ordered the defendant to stop, the marijuana and cocaine were obtained as a result of an unlawful seizure. Thus, the trial court erred in denying the motion to suppress the cocaine and marijuana as fruits of the unlawful seizure.

*Reversed and remanded.*

NADEAU and DALIANIS, JJ., concurred; BRODERICK, C.J., with whom GALWAY, J., joined, concurred in part and dissented in part.

BRODERICK, C.J., concurring in part and dissenting in part. I agree with the majority in declining to adopt the holding in *California v. Hodari D.*, 499 U.S. 621 (1991), for the purpose of determining when a seizure occurs under our State Constitution. Further, because I agree with the majority that the defendant in this case was seized "when Detective Morelli first identified himself as a police officer and ordered [him] to stop," I believe the trial court erred in holding that "the seizure in this case did not occur until the defendant fell and thus submitted to the detective's show of authority." I also concur with the majority that at the moment of the

seizure, Detective Morelli did not have reasonable articulable suspicion that the defendant had been, was, or was about to be, engaged in criminal activity. *See State v. Hight,* 146 N.H. 746, 748 (2001).

I write separately, however, because I do not agree with the majority's analysis concerning the admission of the marijuana and cocaine seized immediately before and subsequent to the defendant's arrest for resisting detention. In light of the intervening circumstance of the defendant's flight in this case, I would employ a variant of the test used in our "consent" cases to determine whether the exclusionary rule should apply. As the trial court did not utilize this test, I would vacate the denial of the defendant's motion to suppress and remand this case to the trial court for further proceedings.

Unlike the majority, I do not believe that the exclusionary rule should automatically be applied in all situations where a defendant is initially seized unlawfully, but then resists detention or arrest. Instead, in deciding whether the exclusionary rule should be applied to suppress evidence obtained as a result of a lawful arrest for resisting detention, I would employ a variant of the three-factor test, previously enunciated in our "consent" cases, to determine if the taint of the unlawful detention had been purged. *See State v. Hight,* 146 N.H. at 750; *State v. Szczerbiak,* 148 N.H. 352, 356 (2002); *State v. McKinnon-Andrews,* 151 N.H. 19, 29 (2004) (Broderick, J., concurring specially); *see also State v. Cobb,* 143 N.H. 638, 650 (1999). Pursuant to this modified test, the trial court should examine: (1) the temporal proximity between the initial illegal seizure and the subsequent search pursuant to the lawful arrest; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *See Hight,* 146 N.H. at 750.

Further, unlike the majority, I do not believe that a case-specific use of the foregoing three-factor test would either "encourage unlawful stops" or "render hollow our rejection of *Hodari D.*" The majority's conclusion, justifying its automatic application of the exclusionary rule, assumes that law enforcement officials knowingly seize individuals on a regular basis without a good faith belief that they have reasonable articulable suspicion to do so, and with the anticipation that those who are unlawfully seized will invariably choose to resist detention. I am reluctant to accept those assumptions.

The three-factor test provides a more subtle check on the conduct of law enforcement officials and will not reward, in most instances, the suspect who flees from a seizure later determined to be unlawful. Where the police attempt to seize a suspect with a good faith belief that they have

reasonable articulable suspicion, the intervening illegal flight of the suspect should not be rewarded by automatic application of the exclusionary rule. A flagrant unlawful seizure in violation of a suspect's constitutional rights, however, followed by the suspect's flight, might well dictate application of the exclusionary rule. In my judgment, the former situation would not taint the later acquired evidence derived from an arrest for resisting detention, while the latter would. In contrast, the majority opinion treats a thoughtful, but erroneous, police seizure, followed by a suspect's flight, and a blatant, bad faith seizure, followed by flight, as exactly the same.

In addition to permitting a more subtle application of the exclusionary rule, use of the three-factor test would not unduly chill law enforcement officials in the execution of their duties or unjustifiably reward suspects who flee police seizures in violation of the law. Because the sanction of RSA 642:2 applies "regardless of whether there is a legal basis for the arrest," there is actually an incentive for the suspect *not* to flee. As such, the stated purposes of the statute—to discourage self-help against, and encourage submission to, a law enforcement official discharging his duties, and to resolve such issues in the preferred forum of the courts—are effectuated. *See State v. Haas*, 134 N.H. 480, 484-85 (1991).

> A society which seemingly becomes more complex with each passing day is enlightened when its laws reflect a high purpose to have apparent differences between those who wield the authority of government, and those who do not, resolved in the courts or by some other orderly process, rather than by physical confrontation on the street or in the gutter.

*Id.* at 484. It should be a rare case where a suspect flees an unlawful seizure in violation of RSA 642:2 and the evidence secured as a result of the lawful arrest for such flight is suppressed.

Finally, given the majority's automatic application of the exclusionary rule, I am concerned that our decision in *Hight* might be called into question. It seems particularly anomalous to me that a person who consents to a search after being unlawfully seized by the police might not be protected by our exclusionary rule, but a person who violates RSA 642:2 after being unlawfully seized is automatically protected by the same rule. For all of these reasons, I respectfully dissent.

GALWAY, J., joins in the opinion of BRODERICK, C.J.